The third case will be 2078-30 United States of America v. Ardit Ferizi. Thank you, Madam Clerk. And representing the United States, Mr. Attias. Thank you, Judge King. Good morning, and may it please the Court. In 2015, the defendant hacked into the server of a U.S. company, stole the personal information of 100,000 of its customers, sifted through that information to identify U.S. military and government employees, and then passed that information on to a notorious ISIS member, knowing that ISIS would use that information to violently target those victims. Mr. Attias, I'm getting a little reverberation maybe from your microphone. I don't know if the other judges hear that. But in any event, there's a lot to unpack here, and I think we're familiar with a lot of the facts there. But I wanted to ask you a question or two, which I would also direct to opposing counsel when it's their turn. As I understand it, this subsequent indictment came down after the notice of appeal was filed in this case. Is that correct? That's correct. So my first question is, what notice are we permitted to take of this second indictment? And if we do take notice of it, to what use can it be put? And in that regard, I don't know if you're familiar with our decision in Colonial Pen v. Coil, which would appear to deal directly with the judicial notice issue. So, Judge Nancy, I think the court can take judicial notice of the new charges. I think the defendant actually agrees with that. The defendant conceded that, I believe, in their response to the government's motion to file a sealed supplemental appendix. As to what use the court can put it to, I think that the new charges are relevant to the extent that the court is grappling with remand versus reversal issue. So, for example, if this court were to remand for further proceedings, then the government would certainly bring up these new charges in addition to other evidence. For example, vaccination status, et cetera. There is a lot in this case, I think, given the amount of time that's passed, that to be very candid, that sort of begs for a remand. The new charges that Your Honor has pointed out and also- The new charges are extremely disturbing. And that's why I wanted to ask as to what use they could be put at this point. So, we don't think the new charges can be used to- Now, Mr. Pius, you're still breaking up a little bit with me, too. I'm sorry, can you hear me now? That seems a little better, yeah. So, I don't think- So, our argument here is not that- We have many arguments that the district court abused its discretion. We do not believe that the court abused its discretion in ignoring these new charges. I do, because, of course, the court didn't know about them. Because the court didn't have them, yeah. Because the court didn't know about them. So, of course, that sort of makes sense. However, the new charges do sort of belie the almost categorical rejection of the government's recidivism concerns, which are sort of patently obvious in this case. And the court dismissed them, the same concerns that the court- We would have to remand to the district court to consider the indictment in the first instance, wouldn't we? I mean, I don't- It never had a chance to do that before. And, I mean, obviously, if these charges were proven, this would be a completely different case. But we couldn't use these- We couldn't use the second indictment for a decision on the merits, I guess, is what I'm getting at at this point. I think that's right, Ron. We have a number of arguments- Why couldn't it be used? So our view is that the district court- I'm not saying that the indictment's a verity. It's returned by the grand jury, and it shows probable cause. I mean, the order here says that this guy gets to go back to Kosovo. There's no way that the United States is going to let him go back to- wants him to go back to Kosovo, I wouldn't think. If he's under indictment in California, they're going to want him to show up for trial in California. That's right, and I think that'll happen regardless of what happens in this case. Again, I think the new charges are relevant to the extent that they undercut the view that the defendant- that there's no sort of risk to the public here. But we don't think- And the court can take judicial notice of them in assessing whether or not a remand is appropriate. But we don't fault the district court for not knowing about them, of course. We're viewing this decision- We don't fault the district court for not knowing about that. Sure. We can't do that, but it happened since the ruling, and so it jumps off the page. For me, it seems like, why shouldn't we give the district court a chance to look at this first? We wouldn't oppose that, Your Honor. That's a very intuitive way of approaching this case, given the amount of time that has passed, that in addition to the fact the vaccines are- But the United States of America is the appellant here, and so what is it that you want us to do with this appeal? So our view, Your Honor, is that this court can reverse the district court on the merits of its decision. I know, but what do you want us to do? You examine what we can do. We certainly can do- We could reverse, and we could remand. Sure, so our- You're the appellant. What are you asking for? So we're asking this court to outright reverse the district court on the merits. We believe that the district court's decision, with its reasoning and on this record, is just untenable, and that there's too much wrong here. Having said that, Your Honor, the practical difference between an outright reversal on the merits and a remand for further consideration is sort of slim in this case because if this court were to outright reverse, there's no textual limit to how many compassionate release motions a defendant can file, so the defendant could just file another one. So there's really no practical difference, but our sort of threshold argument is that this court should outright reverse the district court on the merits of its decision. Tell us your strongest arguments for the reversal, irrespective of this second indictment. Sure, sure. So our first point is that the district court erred in concluding that the defendant did what he did to show off and not because of ideology, and that's a really important point in this case, and we know that the district- We know this is wrong for a number of reasons, the first of which is that the defendant made that claim in 2016, and the court gave it no weight, and we know that for the following reasons. First, when the defendant attempted to justify his actions by mentioning a girl he had met online, the court outright rejected that argument, saying he had plenty of time to think about what was going on. The district court also imposed conditions of supervised release, specifically ordering the defendant to undergo mental health treatment with an emphasis on deradicalization and barred the defendant from having any contact with individuals involved in terrorist activity past or present. Those conditions should seem wholly inappropriate for a defendant that has no problem with ideology and just made a childish mistake to show off to his friends. But I think the clearest evidence that the district court rejected this claim in 2016 is that the defendant is actually in its application of the 2M5.3 enhancement. The defendant, prior to sentencing, argued that that enhancement shouldn't apply, and this is at J75, because he was, quote, boasting about his hacking exploits. The PSR, in turn, maintaining its insistence that the 2M5.3 enhancement should apply, said no, no, no. The defendant did what he did. The defendant hacked, quote, for the sole purpose of providing the PII to ISIS, knowing that ISIS targeted U.S. government employees for violence. That's J323. And the district court accepted the guidelines as properly calculated on the facts of this case, and so it necessarily rejected the defendant's showing off excuse. Also, as just a factual matter, even if I can't convince this court that the district court's reception of the 2016 claim just leads to more questions than it does answers, as a factual matter, that claim is at odds with the record, and those same facts disprove the court's conclusion that the defendant opposes ISIS and was not motivated by ideology. All those facts are listed in our brief, but I'll highlight a few salient ones now. The defendant admitted that during the entire period of the charged conduct, he knew ISIS was engaging in terrorism. He administered a website all on his own that hosted ISIS videos. I think I counted something like 70 videos in the JA. He referred to countries involved in the coalition against ISIS as kuffar countries, which is a term consistent with jihadism. He specifically asked Tariq Hamayoun to confirm his identity as Abu al-Burtani, who he knew was a member of ISIS, and he provided Junaid Hussein with the PII of the 1,300 U.S. citizens This is in a statement of facts. With the understanding that ISIS would use the PII to hit them hard, he knew Hussein intended to create a kill list with the PII and hoped for his success. These are his words. Just when we hit them strong, he directed an offer of technical assistance at three pro-ISIS Twitter accounts, telling them that he could make a script for dedicated servers so that they'd never get their accounts deleted. And then private chats. Again, think about the showing off claim. These are private chats that defended ISIS's release of hit lists containing U.S. service members' information, as well as their highly publicized public beheadings. On this record, and giving everything I just said just as a pure factual matter, the court clearly erred in reaching a conclusion that's so manifestly against the weight of the evidence. And we know clear error occurs when a fact-finding is either not supported by substantial evidence, or it's against the clear weight of the evidence as a whole. The court just fails to account for substantial evidence to the contrary, and I think the district court's decision here checks all those boxes. In our final claim, to the extent that the court isn't convinced that that finding is clearly erroneous, the showing off claim conclusion is just refuted by the guilty plea. The defendant admitted that he provided ISIS with the PII, with the understanding that ISIS would use it to hit them hard. And he also admitted that his actions were not committed for any innocent reason. And under this court's decision in Curry, the court is bound, that's the phrase Curry uses, bound by those admissions. I also point out that in pleading guilty to count three, which is the hacking charge, the defendant necessarily admitted that he hacked in furtherance of the material support violation, which means that he had the intent to promote or advance or to further that material support violation. And of course, that all makes sense, because that is exactly why the defendant did what he did. The day he hacked, on June 13th, the day he hacked into the website, he provided the information to Junaid Hussain. Our second point is that the district court's conclusion that the offense did not involve violence and that none of the individuals whose information he gave to ISIS suffered physical harm is also wrong and at odds with the record. The conclusion about violence is at odds with the court's acceptance of the 205.3 enhancement or the provision of material support with the knowledge that it would be used to commit or assist in the commission of a violent act. As to the court's conclusion about no one suffering physical harm, that's at odds with the court's prior view. It also doesn't fully account for the seriousness of the offense. And just to contextualize the argument, the defendant repeatedly argued at sentencing that nobody was physically harmed and that there was no physical attack. You can see that throughout the sentencing transcript and also in the position papers. But the court rejected that argument again and again, stating in no uncertain terms that just having your name on a list, knowing that you've been identified by a terrorist group, is sufficiently terrorizing. The court noted that the conduct is extremely serious, even if not threats. Right, but that's not a physical act. That's not a physical act, nor did the guideline require a physical act. I understand what you're saying about the violent nature of the threats, but that's a little far afield. Well, the district court's views are definitely at odds with each other. The district court explicitly rejected the argument that the defendants were making at sentencing, where they tried to minimize the seriousness of the offense by saying that there was no physical act. Right, and I understand that the district court imposed the enhancement you're talking about at sentencing and that would seem at odds with the grant of compassionate release. I'm just saying that the enhancement does not require an act of physical violence, which it sounded a little bit like you were saying. No, that's not our argument. I agree with the first part of your statement. The two views are inconsistent, but the guidelines didn't require a physical act. I will point out that in focusing on the need, on the fact that nobody was physically harmed, the district court also erroneously minimized the seriousness of the offense, and we know from this court's decision in Abu Ali, it's actually very similar, that a court erroneously trivializes the severity of the offense by focusing on unrealized harm, and actually the phrase that the district court used here, that nobody was physically harmed, is basically a paraphrase of what Judge Lee said in Abu Ali, that nobody was physically harmed and that this court found to be reversible error. Her final argument relates to the assessment of the need to protect the public from further crimes. As this court knows, the district court denied compassionate release in October because there was no way to secure the safety of the community once the defendant had left the jurisdiction of the United States. The court repeatedly made that point in the October hearing, held that the defendant is a skillful hacker, he harbored animosity to the U.S., mentally unstable, and the court didn't know what kind of guarantees could be placed on him so that he wouldn't re-engage in hacking activities aimed at the U.S. The court said that if he were here, it could supervise him, but I can't do that when he's over there in Kosovo, and so the danger he poses is out there. And then summing up all of our concerns, the court, just black and white, said there's just no ability to guarantee the safety of the community from any future hacking, full stop. But two months later, those exact same concerns were, quote, somewhat alarmist, and as is clear from the record here, nothing changed between October and December. The only justification the court gave for its view was its theory that Kosovo could, was its theory that because the government quickly detected the defendant's crimes in Kosovo five years ago, it could, if I'm understanding the court correctly, do it again, excuse me, in Malaysia, it could do it again in Kosovo. That conclusion is just based on speculation. It's not supported by the record. The fact that the government extradited the defendant from Malaysia five years ago has no bearing on whether it will successfully catch, detect, arrest, extradite the defendant to re-offend in Kosovo. There's also no reason to believe the defendant will even stay in Kosovo. The court also overstates the extent of Kosovo's assistance in concluding that Kosovo actively contributed to the government's investigation. We know Kosovo came here to speak to the defendant after he pled guilty, so that was after the entire case was basically over. Also, the defendant's statement of facts provides that he committed the offenses on a laptop, which the Malaysian authorities turned over to the U.S. I'll also add that the court's conclusion that it was so easy for the government to detect the defendant's crimes is actually inconsistent with the defendant's own position. The defendant argued at sentencing, this is at J86 and J87, that he had the technical skills to hide his IP address and had done so before. Okay, but that didn't stop the government from detecting him then and now, actually. My point here is that the defendant argued at sentencing that he had the technical skills to hide his IP address, but deliberately didn't conceal his identity and location. He also told the psychologist that he liked to use websites that were traceable to him. That, in fact, is how the defendant was caught, because he didn't hide his IP address. That is likely how he was caught so quickly. So any rational actor, having gone through what the defendant just went through, with the skills that the defendant has, would obviously act in a smarter way. My final point, really, is that in dismissing the public safety concerns, the court also just ignored the risk of recidivism. That's patently obvious in this case. The defendant's a self-proclaimed leader of a Kosovo hacking group that claims to have conducted 20,000 hacks worldwide. He received a 2013 alternate sentence for hacking into a government database. The court ignored it, despite the defendant admitting it at sentencing and the court acknowledging at sentencing. We know from the sealed appendix that that crime is remarkably similar to this crime. The defendant admitted at sentencing to having engaged in other hacking prior to this prosecution. It's all over the record. The defendant stated himself that he believes that hacking gives him a sense of power and control and that it is at times morally justified. He's specifically motivated by hacking aimed at the U.S. There's just no reason to think that the defendant here doesn't pose a risk to the public. And my final point is that the district court never— Is this your final point? You've said final point three times now. I'm sorry, Judge Packard. This is my final point with regards to my final point. My final point on the public safety argument is that if you really get to the core of the district court's decision that the government so easily caught the defendant in 2015 and can presumably do it again, it's really a bizarre inversion of the need to protect the public from future crimes. You don't protect the public from future crimes by basically giving a defendant one free pass to commit another crime so long as the all-powerful government can presumably catch you again. You protect the public from future crimes by not releasing a defendant who is clearly dangerous. Your Honor, if there are no further questions, I will come back on rebuttal. Thank you very much, sir. Thank you. Ms. Platt, good to have you with us. Thank you, Your Honors. Good morning, and may it please the Court. This is Caroline Platt on behalf of R.D. Caruzzi. I will begin with Judge Agnew's question about the new charges. I do agree that a court may take judicial notice of filings in another court. I think that's basic black-letter law, but as we said in our filing about the supplemental joint appendix, this court is reviewing the district court's order as of the time the district court issued it, and so the filings in the California court are irrelevant to the merits of the district court's order when she made it. We're aware of what they say now. At a minimum, it seems that would counsel for a remand, regardless of how we would deal with the merits. I mean, the allegations are very disturbing here. I mean, it certainly puts a lie to the argument that he can be supervised in Kosovo if his family are co-conspirators with him. Well, Your Honor. It certainly involves the same crimes for which he was convicted, and while he's incarcerated, he just takes up where he left off. I don't see how we can ignore those. If I may, Your Honor, a couple of points about this. First of all, and I'm not privy to the discovery in the California case because, of course, the United States charged him in a different district than this federal public defender's office, but there's a presumption of innocence, number one. And number two, there's a presumption of innocence on his part, but the indictment is founded on probable cause of return by the grand jury. I agree with that, Judge King. And it calls for a trial on the merits. That's what the Supreme Court said when you have a valid indictment. Yes, Your Honor. To answer your question, he's being detained in California right now. He's still in the custody of the United States in California in pretrial detention. But the fact that he's been charged is certainly relevant to whether it seems to me on the issue of whether we ought to remand this thing for further consideration. And the affidavit is a supporting affidavit for the complaint. I don't know whether we have the complaint or not, but what's in that affidavit is quite disturbing, too. So if I— Rules of evidence, these things, and presumptions of innocence and things, that's for trial purposes, but we're not dealing with that. Well, if I may— It should be released, this compassionate release motion.  I'm sorry, Judge King, I apologize. The exercise of discretion, and I'm talking over you, and I apologize for that, but I had a couple of things I wanted to say. Go ahead. I apologize. I didn't know if you were done. If I may, I would note that I have also looked at the affidavit and the public record. I was able to find it, as I'm sure you and your clerks were on PACER. And I would note there's a couple of things that— obviously, the allegations are allegations of criminal behavior supported by probable cause, and I'm sure that the district judge in the Northern District of California will deal with that. Again, they're in pretrial proceedings right now. But the other allegation that's in there is that the person, or I should say the entity, that did have notice of these allegations since 2017 or 2018 was the United States. And the United States did nothing about these allegations until after the district court in Virginia ordered compassionate release. And at the same time, so they didn't think they were serious enough to follow up until after— There were clearly a lot of folks involved other than this fellow. But they didn't even execute a subpoena, Judge King, until after Judge Brinkman ordered release. I'm sure the United States had plenty of reasons to want to continue their investigation. And this guy was in the penitentiary. But they got people—they had people involved in the investigation that weren't in the penitentiary, I'm sure. And they were wanting to get after them, too. That part might— There's no—I mean, that's—the affidavit says that they didn't even look for evidence in Mr. Farizi's, I think, Google account. And this is all from the affidavit that you mentioned, until after Judge Brinkman ordered compassionate release in this case. And the other thing I'll note is that at the same time, on page 231 of the joint evidence in this case— So is your argument that the government's being unfair to your client here or that they sandbagged him or something? Well, so, Judge Agee, you're anticipating my next sentence, which is that what the government told the district court in this case in Virginia, in our joint appendix on page 231, is, quote, Farizi has been largely successful during his sentence so far. But if you compare that with the affidavit that Judge King is referencing, they knew about these allegations two years before that, from at least 2018. This filing was in September of 2020. Well, the United States is a big place, and it does— you know, you wish that the right hand knew what the left hand was doing, but it doesn't look like anybody in the Eastern District was aware of those things. But, Judge Agee, for legal purposes, the United States is one entity. Well, I understand that, but your client has represented that he's forsworn ISIS. The affidavit refutes that. The district court was going to release him because he could be supervised in Kosovo. Just hold on a minute, counsel. And according to the affidavit, his family are co-conspirators with him. The affidavit shows that he has picked up where he left off with the same crimes, with the same IT stuff, and exposes all sorts of folks to additional hacking. I don't know whether those are true or not, but I don't see how we can ignore them. Your Honor, if I may, before we even get to whether this should be considered at all by the district court or this court, I would like to note that the allegations in California have nothing to do with ISIS. These are commercial hacking crimes, not terrorism-related crimes. Well, the affidavit also says that he's expanded his contacts with ISIS-related terrorists, to include somebody from the 1993 World Trade Center bombing, and that he's included his hacking not only to include United States military in the affidavit, counsel. Hold on a second. When I'm finished, you can talk. Yes, sir. That he's not only expanded beyond the United States military, but Israeli citizens. Again, I don't know whether that's true or not, but that's what the affidavit says. We're talking about a redacted affidavit. There's probably more stuff in there than that. Your Honor, again, I do not have access to any of the discovery or any of the information from these allegations that came out, as you noted, after the notice of appeal was filed in this case. I am not Mr. Frietze's counsel in California. For all of this was, again, uniquely in the possession of the United States, who made different representations to the district court in this case. And so to say that the district court abused its discretion by not considering information that the United States chose not to put before the district court, I think that is why all of this information is completely irrelevant to the district court's exercise of discretion in this case. You're right in that sense that nobody can hold the district court accountable for information it doesn't have. But that doesn't answer the question as to whether or not it should now have that information and reconsider. That's a different prospect. So if I may, Your Honor, I think the answer to this is that by virtue of what the United States told the district court on page 231 in this proceeding, the United States now is stopped from arguing otherwise. They can argue whatever they want in California and let the California court deal with all of that. They can prove it up. They can sentence him appropriately in California. And, again, he's in California to face those charges. But as to this proceeding, the United States is stopped from arguing otherwise of what it argued here. I'm not going to buy into that. But it's something that the district court should have an opportunity to consider. And we're not holding you responsible for the fact that the district court didn't know about this or you didn't know about it beforehand. It developed afterwards. Your Honor, I mean, I understand your position. There was a retaliatory thing, but it's made up or anything like that. It's a grand jury indictment. And it's an affidavit sworn to by the FBI. And it's detailed. I understand that. And there's more to it than we know. All we'd be doing, as Judge Agee mentioned, is maybe a remand and give the district court another shot at it if he wants to pursue the motion. But, Your Honor, the law is that the court of appeals reviews the district court's decision at the time that the district court made its decision. What you're really doing is giving the government a second bite at the apple as the appellant. The government here, as you noted, Judge King, is the appellant, not the appellee. And so what you're really doing is giving the government a second shot, not the district court. And the government is the appellant, certainly. And the judge is going to grant one of these compassionate release motions. They shouldn't be mousetrapped. They ought to get the pertinent information. And, again, Your Honor, it's the government that sandbagged this. And so if I may, under this court's decision – oh, I'm sorry, Your Honor. I didn't hear what you said there. I said it's the government, again, that failed to disclose this information to the district court. And so for them to argue that the district court should be reversed now, which, again, I don't think there's any basis for a reversal as opposed to a mean end. There was no indictment. There was no affidavit. But it was, again, the United States that had all of this information in its possession for multiple years prior to the compassionate release litigation. And if I may, Your Honor, under this court's decision, I'd like to say in Kibble, which came out after we filed our brief in this case, but which we referenced in our 28-J filing. It's a published decision of this court. Grants and denials of compassionate release are both reviewed under a very deferential standard. And so to respond to the rest of my friend's arguments, under the statute, the district courts have very broad discretion. That's language from McCoy and also Kibble. I don't think anybody argues that they have broad discretion, but it's not unlimited. And when you compare the sentencing transcript and the denial a few months before the compassionate release was granted, I mean, it gives you the impression that Dr. Jekyll and Mr. Hyde were at work here. What's the evidentiary basis to say that after all the findings of what a system terrorist this gentleman was, that he can now be supervised in Kosovo? So, Your Honor, as to the supervision. What's the evidentiary basis for that? I mean, it takes you two minutes on the Internet to read the State Department reports and the European Commission reports. Kosovo is just a hotbed for organized crime, particularly dealing with cyber hacking. There's no evidence in the record, Your Honor, that my client was ever involved with organized criminals. He was a teenager at the time of the underlying crime, and he was in Malaysia at university. But the government's argument about supervision, I think, was largely that he would not be able to be supervised in the United States. And I also would like to note there's a factual, I think, just error, I'm sure on my friend's part, in its reply brief, where it says that the district court ordered no supervision in the compassionate release order. On JA-299, the compassionate release order has the exact same supervisory requirements as the original judgment, which is 10 years. Mr. Fritsi will never – And who's going to do it? Right. Regardless of his release date, whether it's now or whether it's in X years, Mr. Fritsi will never be supervised in the United States because, of course, he's a foreign citizen who was extradited here to face prosecution. Well, if he wasn't released, he would still be incarcerated. Well, right. But at some point, Mr. Fritsi will be released. The only question is on what date. And so he's never going to be supervised by a United States probation officer. And so my understanding of the United States' argument below was that he wouldn't be able to be supervised by probation here. That is never going to be possible. Mr. Fritsi stipulated to deportation in his plea agreement, as most foreign defendants do, at the insistence of the United States Attorney's Office, which, again, is very common. So regardless of the year of his release, Mr. Fritsi will never be supervised in the United States. And, again, so – in its reply that Judge Brinkman ordered zero supervision and compassionate release order is wrong. On JA-299, the compassionate – I'm sorry, the supervised release provisions are identical. So what supervision is he going to have in Kosovo? The supervised release provision is the deterrent provision of having supervised release hanging over his head should he violate any of, like, for example, commit a new crime. It's the same as in all of the 1326 appeals, Your Honor. It's the deterrent process. The deterrent is that they're supposedly, if he violates supervised release there, they're going to go find him in Malaysia or Kosovo and bring him back. Right. And then he has that sentence hanging over his head in addition to any new criminal sentence, which is, again, standard in 1326 illegal immigration cases as well as in this case. It's a very standard deterrent thing that district judges impose on criminal defendants. And so – but, again, the supervised release order is exactly the same in the compassionate release order as it is in the original judgment. In fact, the district court referenced the original judgment in the compassionate release order on page 299. Yeah, but the original order anticipated deportation questions or not, that there would be actual supervised release and that they would be supervised by United States probation officers. Yes. Whereas in Kosovo, there isn't anything over there. So, again, the supervised release provision in the compassionate release order is identical to the judgment. It references the judgment. The two orders do not have any differences between them in terms of supervised release, and both of them contemplate deportation. So they have the same terms, and both of them contemplate that he will be deported, which, again, is a requirement in his plea agreement from 2016. Right. Well, what about on a different topic? In the release transcript or order, the district court characterizes the government's position as alarmist. But in all the prior proceedings, it recognized that Mr. Ferrezi had exposed a thousand-plus American military and government personnel to a hit list where their identities could be stolen but where they could also be assassinated. How does that become an alarmist position? So I believe that when the district court referred to the government's position as alarmist, it was referring to the supervised release situation that we were referring to. And I would like to note that on pages 296 and 97 of the compassionate release order, the district judge expressly acknowledged the harm to the victims and the seriousness of the crime as it had at the original sentencing. The two orders are entirely consistent. And so, as we noted in our brief, the government here is not saying that    We're not going to release them. So how does putting all these American citizens on a hit list for assassination morph into a release a few years later? So this is what the court held in Kibble, Your Honor, just a few months ago. As the district court considers the 3553A factors, it considers them and weighs them in light of the extraordinary and compelling reasons that are the basis for a compassionate release motion under 3552C1A. And it gives weight to the factors in light of the extraordinary and compelling reasons that, again, in this case, the government did not We all know that, and we see that a lot of times in drug cases and that sort of thing. But we don't see it too often where you have people who have set up American citizens for murder on a large scale. And it seems like, to me, that's qualitatively different. Well, and again, Your Honor, there's luckily none of the people whose personal information, which in this case, I believe it was names and email addresses, were ever physically harmed, which is a finding on JA188 from 2016. And so I would also like to note, Your Honor, that the compassionate release statute itself says the compassionate release is available in any case, regardless of the crime of conviction. And had Congress wanted to exempt any kind of underlying crime, for example, murder or terrorism or crimes of violence, which we are all familiar with the definition of, Congress could have exempted certain crimes, as it did, for example, in earned time credits and other parts of the First Step Act. And Congress did not exempt any kinds of underlying conviction. Right, because they expect district courts to use their discretion, which can be abused. Well, let me ask you about the standard of review here. Because in reading over the order from the district court, it says that it found that the 3552 factors do not outweigh the compelling grounds for release. And I haven't read that standard in the statute or in any case. And it appears to contradict the standard we set out in United States v. High. Where does this weighing standard come from? So if I may, so the standard in Kibble, as I said, is that the court – sorry, let me finally move to Kibble. And I read High as well. High is, as you know, an explanation of a reasoning case that basically adopted the Chavez-Meza standard from 3582C2, and I think also supports our position here. But what High says is that you have to go through this portal, in effect, of finding that the reasons for – extraordinary reasons exist. The government doesn't question that because of its health situation. And then you consider the 3553A factors anew. And some of the facts may be the same. But I don't see the basis to say, well, once I've found factors for compelling a release, that that outweighs the 3553A factors. I don't see a basis for that standard. Yeah, I think that the standard, Your Honor, as I said – so this is the language from Kibble. It's page 332 of this court's decision in Kibble. The district court reconsiders the 3553A factors in view of the extraordinary and compelling circumstances present in the case. And so the court, I think, you know, just puts them all together in determining whether to exercise its discretion. Because 3553A factors are not all positive or all negative. They're both. As the court well knows, they cut in all directions because there are so many under the seven subsections, and they cut in all directions. But I would say putting Kibble and High together – Ms. Platt, we have said in a lot of cases that from this abuse of discretion review situation that if courts don't understand or recognize all the relevant facts, they necessarily will abuse their discretion. And it seems to me that's what we have here, that the relevant facts weren't there, and that all this indictment and this affidavit and whatever else relates to it are certainly relevant facts on this compassion relief thing. That's just my statement, but I want to ask you a question. Where is this fellow right now being held? In California? Yes, sir. And he's being held on what authority? On the bond or on that indictment? He's being held on the indictment in California, Your Honor. It's a pretrial detention for the California indictment. He's been released pursuant to the order of the district court here, and then he was picked up on that indictment. My understanding is that he was released from the Bureau of Prisons directly – he's never been released. He was released from the Bureau of Prisons directly into ICE custody to be deported to Kosovo. He was in ICE custody for several – or a couple of weeks. And then rather than being deported, he was held by ICE until the California – it was still federal custody until I think the marshals picked him up to transport him to California where he has remained in pretrial detention under the district court of California's custody. Is he held without bond, or does he have conditions of release that he might meet and still leave the country? No, he's detained. He's detained. But detained without conditions of release? That's my understanding, Your Honor. My understanding is that he's incarcerated. As being dangerous? I don't know the answer to that, Your Honor. I have not looked at the transcripts. It may also – I don't want to answer that question, Your Honor, because I don't know the answer. Well, you're his lawyer. I'm not his lawyer in California, Your Honor. You're his lawyer in this proceeding, and I'm asking about the proceeding. Yes, and I would say I've talked to his lawyer in California, but I'm not – yeah, so my understanding is that he's detained in some kind of incarcerative situation in California from having spoken to his California lawyer. All right. But I don't know the grounds for that, the specific grounds for that detention. If I find out otherwise, I will write a letter to the court. If I may, Your Honor, I would just like to reiterate that because the United States is the appellant and failed to raise the facts that the court is concerned that the district court lacked, I would note that I believe that she was both waived and the government has stopped from arguing otherwise, and that under the court's decisions in Kibble and High, the court here clearly considered the various 3553A factors in depth in its written decision, and under the standard in High, which is the Chavez-Mesa standard, and the now standard adopted by this court in Kibble, the district court was well within its discretion and did not make any clearly erroneous findings of fact and did not abuse its discretion on the basis of the record before it when it granted Mr. Fritzi's motion for compassionate release. And so for all the reasons that we've stated in our brief and here today, we would ask the court to affirm the district court if the court does not have any further questions. Thank you very much, Ms. Blatt. We appreciate your good work in this case. Thank you, Your Honors. Mr. Attias, you've reserved a few minutes. Thank you, Judge King. I want to make one quick point on the defendant's argument that he'll never be able to be supervised because he's always going to be deported. I think that argument misses the point. When the defendant's sentence expires sort of naturally, that's that, whether the judge or the government likes it. There's no considering of the 3553 factors at the end of a sentence that just naturally expires. To be released in this context, you need to satisfy the sentencing factors, and that includes the need to protect the public, and that factor clearly isn't satisfied here as the court itself recognized in October. I just want to briefly sum up. The defendant relies on Kibble. I think Kibble really hardly moves the needle. Kibble just tells us that this court, just like every other court, reviews these decisions for abuse of discretion. Our argument seeks nothing more than just to vindicate well-established principles governing abuse of discretion. We know that abuse of discretion can take many forms. As relevant here, we're dealing with findings that are clearly erroneous, either because they're totally against the weight of the evidence or because the court fails to count. Mr. Attias, I have a question. Opposing counsel says the government sandbagged Appellee and the court, the district court here. When did the Eastern District of Virginia United States Attorney's Office become aware of the allegations or the investigation underlying this new indictment in California? Your Honor, I can't tell you exactly what I found out. All I know is that it happened after the defendant was released, and as soon as the government found out about the new charges, we wrote a letter to the court and to the defendant, actually, informing the court the best the government could do. So just to be clear, I know you found out about the new charges after the compassionate release order. Did the Eastern District of Virginia U.S. Attorney's Office know about the allegations or the underlying investigation at the time of the compassionate release motion? I do not know the answer to that question. Did you say you do not know the answer? I just don't know the answer to that question. What I can tell you, though, just to refute what my friend on the other side says, is that as soon as the government found out about these charges, we filed a sealed notice to the court to the extent that the court took no action. It's been almost a year. To the extent that the defendant thinks that we violated the court's order, the court took no action. The defendant hasn't made a motion. If they think we did so, they should make a motion. I guess on remand at the district court, if the case is remanded, the district court might be interested in that.  That would be the most appropriate and natural place to have this argument. But to raise it here in a parenthetical, in a brief, and then sort of casually at oral argument, I don't think that makes any sense. Again, we told the district court and the defendant at the time we found out about the charges, and the district court took no action. Just to briefly sum up, we recognize that abusive discretion principles are deferential. We know that, but we also know that abusive discretion is not toothless and that this court is not a rubber stamp. I think this case is really quite simple. You can line up all the court's various findings from 2016 and 2020. You can line up the findings on dangerousness from October 2020 and December 2020. If the court believes that a district court can undercut the record to that extent or so easily repudiate its prior views or be that inconsistent and still not abuse its discretion, then we lose. But I don't think abusive discretion principles support that result. With respect to the extremely experienced district judge, this is one of those rare situations where a district court abuses its discretion. The evidence is plain to see. It's black and white on the record, and the defense counsel both here and in response can hardly muster an argument on the merits to explain the various contradictions that are plain on this record, and we'd ask this court to reverse. Thank you very much, sir. We appreciate it. And as you know, if we were in Richmond, we'd shake your hands and thank you for coming to be with us, but we can't do that today. But we do thank you for being with us, and we'll take the third case under advisement, and Madam Clerk, we'll excuse the lawyers, and the court will reconvene for a conference. Thank you, Judge Kennedy. Thank you, Your Honors.
judges: Robert B. King, G. Steven Agee, Stephanie D. Thacker